[Cite as *State v. Conley*, 2025-Ohio-136.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2024-06-073 |
| | : | O P I N I O N |
| - vs - | | 1/21/2025 |
| | : | |
| MICHAEL CONLEY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM MIDDLETOWN MUNICIPAL COURT
Case No. CRB 2302978

Kidd & Urling LLC, and Thomas W. Kidd, Jr., for appellant.

Zachary A. Barnhart, General Counsel for City of Middletown, for appellee.

**PIPER, J.**

{¶ 1} Appellant, Michael Conley, appeals his conviction in the Middletown Municipal Court after a jury found him guilty of one count of fourth-degree misdemeanor failure to disclose his personal information in violation of Middletown Cod.Ord. 606.30(a)(1). For the reasons outlined below, we affirm Conley's conviction.

**Facts and Procedural History**

{¶ 2} On the evening of November 10, 2023, at approximately 7:40 p.m., Conley was arrested and charged with the above-named offense. The charge arose after it was

alleged Conley, while sitting in his vehicle parked on the street outside of a woman's home located in Middletown, Ohio, failed to provide his name, address, or date of birth when asked for that information by Middletown Police Officer Ryun Rawlins.

{¶ 3} The record indicates that Officer Rawlins asked Conley to provide him with his name, address, or date of birth after dispatch received two 9-1-1 calls from a woman asking for assistance with a suspicious man sitting in his car parked outside her home with his vehicle's headlights turned off. The woman made these two 9-1-1 calls after Conley purportedly asked her to "come here" while she was letting her dog out the front door. The record indicates that the woman made these two 9-1-1 calls because Conley, whom she did not know, was scaring her and making her nervous given their previous interaction.

{¶ 4} On May 9, 2024, the matter proceeded to a one-day jury trial. During trial, the jury heard recordings of the two 9-1-1 calls the woman made to police. The jury also heard testimony from two witnesses. Those two witnesses being (1) the arresting officer, Officer Rawlins, and (2) the defendant, Conley. The following is a summary of those two 9-1-1 calls, as well as Officer Rawlins' and Conley's respective trial testimonies.

*Summary of the Two 9-1-1 Calls*

{¶ 5} The woman's first 9-1-1 call came in at 7:33 p.m. During this call, which last approximately two minutes and ten seconds, the woman reported that she was looking out her side room window and noticed a car "sitting out there" at the end of her driveway with its headlights on. The woman reported that, after noticing the car at the end of her driveway, she walked outside to let her dog out and to ask the vehicle's driver, later identified as Conley, what he was doing there. Upon her coming outside, the woman reported that Conley shouted out to her, "hey, come here, come here, I need to talk to you, I need to talk to you," to which the woman replied, "um, no. Who the hell are you

- 2 -

and what are you doing here?" The woman reported that Conley did not respond to her questions.

{¶ 6} The woman claimed that Conley instead shouted out to her, "come here, come here," to which she replied, "What do you want?" The woman reported that Conley then, for the third time, shouted out to her to "come here, come here" before turning off his vehicle's headlights. The woman reported that, after turning off his vehicle's headlights, Conley was just sitting there in his car parked at the end of her driveway. The woman then advised the 9-1-1 dispatcher, "This shit makes me nervous as hell." The call ended with dispatch telling the woman that police were on their way to investigate, to which the woman replied, "I mean, he's right here, I can see him right out my window, he's still sitting here . . . I was just trying to let my Shih Tzu out the front door . . . Please hurry."

{¶ 7} The woman's second 9-1-1 call came in to dispatch just three minutes later at 7:38 p.m. During this call, which lasted approximately one minute and seven seconds, the woman advised the 9-1-1 dispatcher that she was "too scared" to walk outside to Conley's car to see what Conley may have wanted because she did not know who this man was sitting in his car parked at the end of her driveway. To this, the 9-1-1 dispatcher instructed the woman not to walk down to Conley's car, that an officer was on his way, and that, if Conley left, to let the dispatcher know which way he went. Upon being so advised, the woman then told the 9-1-1 dispatcher that she was then going back up onto her porch to wait for the officer's arrival. The 9-1-1 dispatcher then advised the woman that, "If you don't know who it is and he's scaring you, absolutely go back in the house." This call concluded when Officer Rawlins arrived at the scene and parked his cruiser behind Conley's vehicle parked at the end of the woman's driveway.

*Summary of Officer Rawlins' Trial Testimony*

{¶ 8}   Officer Rawlins testified that, on the night in question, he was dispatched to a woman's home to investigate "a call of a suspicious vehicle and person."   Officer Rawlins testified that, upon arriving at the scene, and to investigate the matter further, he conducted "essentially" a traffic stop on Conley's vehicle parked at the end of the woman's driveway.   Upon making this stop, Officer Rawlins testified that he walked up to Conley's car, introduced himself, and asked Conley to provide him with his name and date of birth.   However, rather than simply answering Officer Rawlins' questions, Officer Rawlins testified that Conley "refused and told me that he did not have to give me that information . . . ."

{¶ 9}   Undeterred, Officer Rawlins testified that he asked Conley for his name and date of birth again, as well as for "an Ohio ID or any type of ID that he has on his person."   But, just as before, Officer Rawlins testified that Conley "continued to refuse to give me any sort of identification."   Officer Rawlins testified that Conley did this "multiple, multiple times."   Officer Rawlins testified that it was at this point, after a fellow officer had spoken with the woman who had twice called 9-1-1 on the suspicious looking Conley, that he placed Conley under arrest for failing to disclose his personal information in violation of Middletown Cod.Ord. 606.30(a)(1).

*Summary of Conley's Trial Testimony*

{¶ 10} Conley, who acknowledged that he did not live on the woman's street, claiming instead to have parked in front of her house so that he could pick up a piece of mail that was inadvertently sent to a different house located further down the road, testified regarding his initial interactions with Officer Rawlins as follows:

> I was in my vehicle and I was getting ready to drive off for work
> that evening the vehicle approached from behind the lights
> were on and my window was rolled up he [Officer Rawlins]

tapped on the door I rolled my window down and he proceeded to ask for identification and I of course proceeded to ask him what was wrong I didn't know why I guess I was being ask[ed] for as he was the first officer on the scene he did explain to me that he received a call from a lady who didn't know who I was and didn't recognize me [and] the car and I said is this in [and] of itself a crime and he said no and so based on my understanding of the Ohio Revised Law, if I haven't committed a crime, I'm not in the process of committing a crime, or you don't have the (unintelligible) suspicion I'm not required to give you identification given that I'm parked doing nothing wrong. That was the interaction I had with him [Officer Rawlins] at first.

{¶ 11} Following this testimony, Conley testified that he then asked Officer Rawlins what crime the officer believed he had committed by simply sitting in his car parked on a public street. To this, Conley testified that Officer Rawlins informed him that he was investigating "the call of the lady she stated that she didn't recognize the car or the person in it." Conley also testified that "the only thing" Officer Rawlins kept saying to him was that "they got a call based on someone that this lady doesn't know in a car that she's never seen before that was it."

*The Jury's Verdict, the Trial Court's Sentence, and Conley's Appeal*

{¶ 12} Following deliberations, the jury returned a verdict finding Conley guilty as charged. Upon the jury issuing its verdict, the trial court proceeded to sentencing. At sentencing, the trial court sentenced Conley to 30 days in jail, all of which was suspended, and ordered Conley to pay a $250 fine plus court costs. The following month, on June 4, 2024, Conley filed a notice of appeal. Following briefing, on December 9, 2024, this court heard oral argument on the matter. Conley's appeal now properly before this court for decision, Conley has raised one assignment of error for review.

**Conley's Single Assignment of Error**

{¶ 13} THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW AND/OR AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN CONLEY'S

CONVICTION.

{¶ 14} In his single assignment of error, Conley argues his conviction for failing to disclose his personal information in violation of Middletown Cod.Ord. 606.30(a)(1) was not supported by sufficient evidence and/or was against the manifest weight of the evidence. We disagree with both of Conley's claims.

*Standards of Review*

{¶ 15} A claim challenging the sufficiency of the evidence "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 2013-Ohio-5202, ¶ 34 (12th Dist.). When making such a determination, "[t]he relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Roper*, 2022-Ohio-244, ¶ 39 (12th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. When conducting this inquiry, "appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *State v. Carter*, 2018-Ohio-29, ¶ 7 (8th Dist.), citing *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79-80. Therefore, when reviewing whether a jury's verdict finding the defendant guilty was supported by sufficient evidence, "[t]his court merely determines whether there exists any evidence in the record that the trier of fact could have believed, construing all evidence in favor of the state, to prove the elements of the crime beyond a reasonable doubt." *State v. Brummett*, 2024-Ohio-2332, ¶ 9 (12th Dist.). "A reversal based on insufficient evidence leads to an acquittal that bars a retrial." *State v. Powers*, 2024-Ohio-1521, ¶ 25 (12th Dist.).

{¶ 16} "Unlike the sufficiency-of-the-evidence standard of review," which, as noted above, addresses the state's burden of production, "'a manifest-weight-of-the-evidence

standard of review applies to the state's burden of persuasion.'" *State v. Casey*, 2024-Ohio-689, ¶ 10 (12th Dist.), quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lewis*, 2020-Ohio-3762, ¶ 18 (12th Dist.), citing *State v. Wilks*, 2018-Ohio-1562, ¶ 168. But, even then, a determination regarding the witnesses' credibility is primarily for the trier of fact to decide. *State v. Baker*, 2020-Ohio-2882, ¶ 30 (12th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Therefore, given that it is primarily the trier of fact who decides witness credibility, this court will overturn a conviction on manifest-weight grounds "only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Kaufhold*, 2020-Ohio-3835, ¶ 10 (12th Dist.). This may occur only when there is unanimous disagreement with the jury's verdict. *State v. Marcum*, 2016-Ohio-263, ¶ 10 (12th Dist.), citing *State v. Gibbs*, 134 Ohio App.3d 247, 255 (12th Dist.1999).

*Middletown Cod.Ord. 606.30(a)(1)*

{¶ 17} Conley was convicted of failing to disclose his personal information in violation of Middletown Cod.Ord. 606.30(a)(1). Pursuant to that ordinance, "[n]o person who is in a public place shall refuse to disclose the person's name, address, or date of birth, when requested by a law enforcement officer who reasonably suspects . . . [t]he person is committing, has committed, or is about to commit a criminal offense." The ordinance therefore applies to questioning in the context of an investigative detention, more commonly referred to as a *Terry* stop, rather than to questions posed during a

consensual encounter.[1]  *See State v. Fulton*, 2024-Ohio-2880, ¶ 9 (1st Dist.); and *State v. Guleff*, 2024-Ohio-748, ¶ 42 (5th Dist.) ("Failure to disclose personal information applies to anyone who is stopped by a law enforcement officer for an investigative detention.").[2]  Contrary to an investigative detention, "[a] consensual encounter occurs 'where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away.'" *State v. Kirk*, 2020-Ohio-323, ¶ 20 (12th Dist.), quoting *State v. Tabler*, 2015-Ohio-2651, ¶ 21 (10th Dist.).

*Conley's Argument and Analysis*

**{¶ 18}** Conley argues his conviction was not supported by sufficient evidence and/or was against the manifest weight of the evidence because, according to him, there was no evidence presented by the state to establish Officer Rawlins reasonably suspected that he was committing, had committed, or was about to commit a criminal offense upon Officer Rawlins' approaching him in his vehicle parked on a public street. However, unlike in the case upon which Conley relies, *State v. Dickman*, 2015-Ohio-1915 (10th Dist.), a case in which the defendant was merely sitting in the passenger's seat of an SUV parked in a Kroger grocery store parking lot during the store's normal business hours when approached by police, in this case, Officer Rawlins, on a dark evening in the late fall, asked Conley to provide him with his name and date of birth while he was sitting in his car parked outside on the street in front of a woman's home with his vehicle's

---

1. A *Terry* stop is an investigative detention made in reference to the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968).

2. The wording set forth in Middletown Cod.Ord. 606.30(a)(1) is identical to the wording provided for in R.C. 2921.29(A)(1). Therefore, given their identical wording, case law discussing the latter is relevant when determining whether Conley's conviction of the former was supported by sufficient evidence and/or against the manifest weight of the evidence. This would include, for instance, the First District's decision in *Fulton* and the Fifth District's decision in *Guleff*.

headlights turned off, the same woman who, by the time Officer Rawlins had arrived at the scene, had already called 9-1-1 twice to report the suspicious Conley to police.

{¶ 19} The record indicates the woman made these two 9-1-1 calls, one at 7:33 p.m. and the other at 7:38 p.m., because she was understandably scared, obviously worried, and very nervous about the strange man, who just moments before had yelled out "come here, come here" while she was letting her dog out the front door, sitting parked on the street at the end of her driveway with his vehicle's headlights turned off. Given this evidence, Conley's conviction was undoubtably supported by sufficient evidence and not against the manifest weight of the evidence. This is because Officer Rawlins, upon initially approaching Conley while he sat in his parked car outside the woman's home, had a reasonable suspicion that Conley was committing, had committed, or was about to commit a criminal offense given the information provided to him by dispatch. This includes, but is not limited to, any number of the harassing type crimes found in the Ohio Revised Code.

{¶ 20} For example, pursuant to R.C. 2917.11(A), no person shall recklessly cause inconvenience, annoyance, or alarm to another by engaging in certain activities. As set forth under R.C. 2917.11(A)(4), these activities include "[h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender." "The refusal to allow an individual on or off one's personal property can be a violation of R.C. 2917.11(A)(4)." *State v. Florence*, 2014-Ohio-167, ¶ 22 (12th Dist.). This is essentially what Conley did in this case by sitting in his car parked outside of a woman's home who just a few moments earlier had refused his advances and requests that she "come here, come here." *See, e.g., id.* at ¶ 21-26 (finding refusal of boyfriend to give back his girlfriend's car

keys for upwards of 20 to 30 minutes even after law enforcement arrived at the scene was sufficient to uphold a disorderly conduct conviction in violation of R.C. 2917.11[A][4]).

{¶ 21} This holds true regardless of whether the arresting officer can thereafter, while on the stand testifying at trial, articulate the exact and specific crime for which the officer had a reasonable suspicion to believe the defendant was committing, had committed, or was about to commit. To hold otherwise would present an unnecessary burden on the state by effectively inserting an additional element into the language of ordinance where none otherwise exists. We may not add to or delete words from an ordinance to understand its meaning. *See State ex rel. Harris v. Rubino*, 2018-Ohio-3609, ¶ 27 (noting that adding to or deleting words from a charter "in order to turn references to a proposed ordinance into references to a certification ordinance . . . would be contrary to the principles of statutory construction"). This includes the ordinance at issue in this case, Middletown Cod.Ord. 606.30(a)(1). Therefore, finding no merit to Conley's argument herein, Conley's single assignment lacks merit and is overruled.

## Conclusion

{¶ 22} For the reasons outlined above, and finding no merit to the single assignment of error raised by Conley herein, Conley's appeal challenging his conviction for one count of fourth-degree misdemeanor failure to disclose his personal information in violation of Middletown Cod.Ord. 606.30(a)(1) is denied.

{¶ 23} Judgment affirmed.

BYRNE, P.J., and HENDRICKSON , J., concur.